# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **iLIFE TECHNOLOGIES INC.** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-990 |
| | ) | |
| **BODY MEDIA, INC.** | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This patent infringement case involves five asserted patents, which generally disclose systems and methods for evaluating, detecting, or analyzing movement or activity of a body in relationship to an environment. (ECF No. 66 at 6.) The five patents-in-suit are United States Patent Numbers 6,307,481 (the "'481 Patent"), 6,703,939 (the "'939 Patent"), 7,095,331 (the "'331 Patent"), 7,145,461 (the "'461 Patent"), and 7,479,890 (the "'890 Patent"). iLife Technologies, Inc. ("iLife") is the owner by assignment of these patents. (ECF No. 66-1 at 7, 24, 50, 76, and 106.) iLife accuses Body Media, Inc. ("Body Media") of infringing certain claims of each of the patents-in-suit. (ECF No. 66-1 at 4-5.) This court recently issued its opinion and order on claim construction. (ECF Nos. 105-06.)

On November 26, 2014, Body Media filed an amended answer and counterclaim in which it asserted, for the first time, an allegation that the asserted patents are unenforceable due to inequitable conduct. (ECF No. 70 at 16-42.) Pursuant to court order, amended pleadings were due by November 28, 2014, and, therefore, Body Media's filing was timely and proper in that respect. (ECF No. 61.) iLife filed a motion to dismiss the inequitable conduct counterclaim, arguing that Body Media failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 79, 80, 94.) The parties argued the motion to dismiss at the end of the February 3,

2015 Markman hearing, and, at the request of the court, submitted additional briefing thereafter. (ECF Nos. 102 and 103.) Body Media attached to its submission a district court decision issued on February 19, 2015, denying iLife's motion to dismiss an identical inequitable conduct counterclaim asserted by Body Media's parent company AliphCom against iLife in litigation pending in the United States District Court for the Northern District of California. (ECF No. 103-3 (iLife Technologies, Inc. v. AliphCom, No. 14-3345 (N.D. Cal. Feb. 19, 2015) (hereinafter "AliphCom").) On February 26, 2015, this court again heard oral argument on iLife's motion to dismiss. (2/26/2015 Minute Entry.)

For the reasons set forth below, the motion is denied with respect to the inequitable conduct counterclaim to the extent it is pled with respect to the '939, '331, '461, and '890 Patents.

## I.  Legal Standards

The standards for pleading and proving inequitable conduct are related, but different. The pleading standard is set forth in Exergen Corporation v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009), and the merits standard is set forth in Therasense, Inc. v. Becton, Dickinson & Company, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011) (en banc). Delano Farms Co. v. Cal. Table Grape Comm'n, 655 F.3d 1337, 1350 (Fed. Cir. 2011) (applying Exergen's pleading requirements to a motion to dismiss after Therasense was decided).

### A. *Exergen*'s Pleading Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Twombly, 550 U.S. at 556. These requirements apply with equal rigor to pleadings made under Rules 8 and 9 of the Federal Rules of Civil Procedure. Iqbal, 556 U.S. at 686-87.

Inequitable conduct, like similar allegations of fraud or mistake, must be pled with particularity under Rule 9(b). Exergen, 575 F.3d at 1326. "A pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the United States Patent and Trademark Office ("PTO"). Id. at 1328-29. A "reasonable inference" is "one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." Id. at 1329 n.5; Delano Farms, 655 F.3d at 1350.

In order to properly plead inequitable conduct in a patent case, Rule 9(b) requires identification of the specific who, what, when, where, why, and how of the material misrepresentation or omission committed before the PTO. Exergen, 575 F.3d at 1328. To satisfy the "who" and "when," the pleading must name the person who knew of the material information and deliberately withheld or misrepresented it, and indicate when the conduct took place. Id. at 1329. To plead the "what" and "where" of the material omissions, the pleading must identify "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found." Id. The pleading must set forth "why" the withheld information was material and not cumulative, and "how" an examiner would have used the information in assessing patentability. Id. The pleading must indicate "the particular claim limitations, or combination of claim limitations," that are supposedly absent

from the information of record. Id.  A factual deficiency with respect to any of the above elements is "fatal under Rule 9(b)." Id. at 1330.

### B. *Therasense*'s Merits Standard

To establish inequitable conduct on the merits, a challenger must prove that: (1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information to the PTO; and (2) the individual did so with a specific intent to deceive the PTO. Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178, 1181 (Fed. Cir. 1995); 37 C.F.R. § 1.56.  The Court of Appeals for the Federal Circuit heightened the standard for proving inequitable conduct based upon nondisclosure of a reference to the PTO in Therasense. Under Therasense, absent evidence of affirmative egregious misconduct, a challenger must prove, by clear and convincing evidence, both that: (1) "the patentee acted with the specific intent to deceive the PTO;" and (2) the nondisclosed reference was a "but for" cause of the PTO's allowance of the claims. Therasense, 649 F.3d at 1291-92.  In order to satisfy the first requirement, the challenger must prove that the patentee: (1) knew of the reference; (2) knew that it was material; and (3) made a deliberate decision to withhold it. Id. at 1290.  In other words, in a case involving nondisclosure of information, unless the challenger presents clear and convincing evidence that the patentee made a deliberate decision to withhold a known material reference, there can be no inequitable conduct. Id.; 1st Media, LLC v. Electronic Arts, Inc., 694 F.3d 1367, 1373-77 (Fed. Cir. 2012) (reversing district court's finding of inequitable conduct because there was no proof of a "deliberate decision to withhold" or "anything that would support such an inference").

Although intent can always be, and usually is, proven by indirect evidence, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" Therasense, 649 F.3d at 1290. After Therasense, intent to deceive can no longer be inferred from nondisclosure of a reference solely because that reference was known and material; there must be some evidence to prove or support an inference with that patentee made a deliberate decision to withhold the reference. Id.

C. **Applicable Legal Standard**

Before the court is a motion to dismiss Body Media's inequitable conduct counterclaim. (ECF No. 79.) The appropriate legal standard, therefore, is set forth in Exergen. Accord AliphCom at 7 n.1.

II. **Body Media's Allegations of Inequitable Conduct**

Body Media makes two assertions with respect to inequitable conduct: (1) the inventor of the patents-in-suit, Michael Lehrman, ("Lehrman"), stated in an email written in February 2003 that he knew how to "take down" iLife's fall detection patents; and (2) Lehrman and the prosecuting patent attorney, William Munck, ("Munck"), withheld prior art references from the PTO that were disclosed during European patent prosecution proceedings of foreign counterpart patents. (ECF No. 73 at 16-44.) According to iLife, Body Media's pleading is an "'offensive and unprofessional' litigation tactic" that consists of "flimsy facts" and "rank speculation." (ECF No. 94 at 5.)

For the reasons set forth below, the court finds Body Media's pleading sufficient to state a claim of inequitable conduct with respect to the '939, '331, '461, and '890 Patents.

## III. Analysis

### A. The Email

Body Media contends that Lehrman engaged in inequitable conduct based upon statements that he made to Ray Mirza, an official at East River Ventures LP, in a February 24, 2003 email. In that email, Lehrman argues in favor of securing greater financial benefits for himself during an apparently anticipated round of financing of iLife by stating that he "know[s] how to take down [iLife's] fall detection patents" and that "a really determined effort to invalidate the patents, if performed skillfully could succeed." (ECF No. 91 at 3.) Lehrman states in the email that his knowledge applies to "both two axis and three axis" patents. (Id.) Given the context and purpose of the email, the statement can be described, at best, as boasting, and, at worst, as threatening. The email does not state the legal or factual basis for Lehrman's opinion that iLife's patents could be invalidated. Lehrman's use of terms such as "determined effort" and "performed skillfully," however, supports an inference that the grounds for invalidity would be legally or technologically complex, and not based upon a mere technicality that any challenger could discover, such as failure to pay required fees or an error in ownership. Lehrman goes on to state in this email that he considers it one of his "continuing roles [] to keep improving [iLife's] proprietary position by filing new patents." (Id.) At the time this statement was made, four of the five patents-in-suit had not yet issued. (ECF No. 103-1.)

A reader of the February 2003 email does not know whether Lehrman was bluffing or not, what Lehrman knew at the time he drafted the email, on what grounds he believed iLife's patents were subject to attack, and whether such grounds were of the kind subject to disclosure to the PTO. The reader does not know what Lehrman knew, and more importantly, whether what Lehrman knew was subject to disclosure at the PTO. Measured against these "unknowns," however, is that Lehrman's threat is directed explicitly to the validity of iLife's patents, and that Lehrman explains that the effort to invalidate the patents would require determination and skill.

As discussed below, Body Media alleges sufficient facts from which it can be reasonably inferred that Lehrman knew about the prior art relied upon by the European Patent Office (the "EPO") to reject iLife's foreign counterpart patent applications about a year later. The EPO's rejection of iLife's applications and the reasonable inference that Lehrman knew about the invalidating prior art cited by the EPO, when combined with Lehrman's statements in the February 2003 email about knowing how to "take down" iLife's patents, support a reasonable inference that Lehrman possessed information material to the validity of iLife's patents that should have been disclosed to the PTO as of February 24, 2003. Lehrman did not threaten to disparage iLife or its products, or to disassociate himself from iLife and secure superior rival patents for a competitor; he threatened to "invalidate" iLife's patents and then stated his belief that he was responsible for improving iLife's "proprietary position by filing new patents." The combination of the email, the EPO's rejection of certain foreign counterpart patent applications based upon invalidating prior art, and the reasonable inference that Lehrman knew about the EPO's subsequent identification of invalidating prior art, is sufficient factually to allow

7

a court to drawn the reasonable inference that inequitable conduct occurred, at least as of the date of the email. Twombly, 550 U.S. at 556.

At the time Lehrman made the statements in the email, the '939 and '461 Patents were in prosecution before the PTO, and the applications that lead to the '331 and '890 Patents were not yet filed. The knowledge expressed in Lehrman's email could have affected any of these four patents, and provides a factual predicate for an inequitable conduct claim as to each of them. There is no factual basis, however, on which to find or infer that Lehrman possessed the knowledge referenced in the February 2003 email between September 1999 and October 2001, when the '481 Patent was being prosecuted. Although Lehrman alleges that his threat concerns both the two- and three-axis patents, and although the '481 Patent can be described as a two-axis patent, there is no basis on which to conclude that Lehrman had any knowledge about invalidity at the time the '481 Patent issued more than a year and a half earlier. The email cannot support a claim that the '481 Patent is unenforceable due to inequitable conduct. Fact discovery might prove otherwise, but as drafted, Body Media's inequitable conduct counterclaim based upon Lehrman's email must be limited to the unenforceability of the '939, '331, '461, and '890 Patents.

### B. The European Prior Art References

Body Media contends that Lehrman and Munck engaged in inequitable conduct by withholding from the PTO invalidating prior art references identified by the EPO during prosecution of foreign counterpart patent applications. (ECF No. 103-1.) At the time of these EPO proceedings, Munck and Lehrman were prosecuting three of the five patents-in-suit before the PTO. (Id.)

With respect to this aspect of Body Media's inequitable conduct claim, the court concludes that Body Media sufficiently plead the who, what, when, where, how, and why required by Exergen. Body Media's counterclaim names Lehrman and Munck, identifies three pieces of allegedly invalidating prior art identified during the EPO proceedings, includes specific allegations, including claims charts, explaining how the PTO would have used the prior art to disallow certain claims of the '890, '331, and '461 Patents, and explains why the prior art would have been noncumulative. (ECF No. 73 ¶¶ 61-191.) More specifically, the counterclaim identifies European Patent Application Nos. 01987107.8 and 02721362.8 as the relevant counterpart EPO applications (the "EPO Applications"), and U.S. Patent No. 6,160,478, European Patent Application No. 0877346, and British Patent Application Publication GB2323196 as the invalidating prior art identified during the EPO proceedings (the "EPO Prior Art"). (ECF No. 73 ¶¶ 67, 81.) Body Media contends that the EPO Applications "disclosed and claimed substantially similar subject matter as that disclosed and claimed in the [patents-in-suit]" and demonstrates this allegation by attaching detailed invalidity claims charts to its counterclaim. (ECF No. 73 ¶ 67, 77-1 to -3.) Body Media explains that the EPO Prior Art was material to prosecution of the patents-in-suit because the EPO Prior Art discloses systems that measure both dynamic and static acceleration, a feature that iLife contended made its inventions novel during proceedings at the PTO. (ECF No. 73 ¶¶ 93, 97, 130, 133, 168, 171; ECF No. 105 at 18-19.) Body Media's counterclaim cannot be described as "threadbare," "conclusory," or generally alleged. Iqbal, 129 S.Ct. at 1949.

    iLife's actual objection to Body Media's counterclaim is that there are insufficient facts to support a plausible inference that Munck or Lehrman knew about the withheld references cited by the EPO, and deliberately withheld them from the PTO. All that Body Media must do

9

at the pleading stage is aver facts supporting a reasonable and plausible inference, flowing logically from the facts alleged, that Munck or Lehrman knew about the EPO prior art references, and withheld them with a specific intent to deceive the PTO. Exergen, 575 F.3d at 1328-29 & n.5; Delano Farms, 655 F.3d at 1350. Deceptive intent may be pled based upon information and belief where essential information lies uniquely within another party's control and the pleading sets forth the specific facts upon which the belief is reasonably based. Exergen, 575 F.3d at 1330.

Body Media avers numerous facts establishing that Munck was involved in the prosecution of iLife's counterpart and related patents in Europe, which support a reasonable inference at the pleading stage that he was aware of the EPO's identification of prior art, but decided not to disclose it to the PTO. Body Media alleges that: (1) Munck filed the Patent Cooperation Treaty ("PCT") applications that led to the two EPO Applications in which the EPO Prior Art was cited, (Id. ¶ 67-69); (2) the EPO Applications disclosed and claimed substantially similar subject matter as was disclosed and claimed in the patents-in-suit, which were prosecuted by Munck, (Id. ¶ 67); (3) Munck received notices about the progress of prosecution before the EPO from foreign patent counsel, (Id. ¶ 70); (4) Munck disclosed an International Search Report during prosecution of a related patent before the PTO, but did not disclose the EPO Prior Art during prosecution of the patents-in-suit, (Id. ¶ 71); and (5) Munck paid invoices issued by the European law firm that appeared on behalf of iLife at the EPO, (Id. ¶ 72.)

At the Markman hearing, iLife contended that an inference could not be drawn with respect to Munck's knowledge based upon Mentor Graphics Corporation v. EVE-USA, Inc., 13 F.Supp.3d 1116, 1126 (D. Or. 2014). In that case, the district court concluded that senior in-house patent counsel, who had appointed an outside law firm to prosecute all the company's

patent applications, could not be presumed to know about the details of any particular patent's prosecution, including what prior art references were cited in an office action as rendering an invention obvious. Mentor Graphics, 13 F.Supp.3d at 1126. The court concluded that, at most, the supervisory in-house counsel could be assumed to have "general awareness" of a particular patent application. Id. The facts in the instant case are different. Munck was responsible for prosecuting the patents-in-suit for iLife. Body Media submits evidence reflecting that Munck signed numerous documents as iLife's agent in the file wrapper of each patent-in-suit. (ECF No. 103 at 9-10 & n.9; ECF No. 103-6.) This alone sufficiently distinguishes Mentor Graphics. Munck was not a supervisory in-house counsel generally responsible for overseeing outside counsel's activities before the PTO; he was the patent attorney who personally prosecuted the patents-in-suit on behalf of iLife before the PTO. When this fact is combined with the allegations summarized above establishing Munck's involvement and communications with, and supervision of European patent prosecution counsel, a reasonable inference can be made that Munck knew that the EPO identified prior art that invalidated foreign counterpart patent applications while he was prosecuting the '331, '461, and '890 Patents before the PTO, but did not disclose it with the intent to deceive.

With respect to Lehrman, Body Media avers that Lehrman was the named inventor on both EPO Applications and received communications about their progress from European patent prosecution counsel. (ECF No. 73 ¶¶ 75-77.) Combined with Lehrman's statements in the February 2003 email about the important role he played with respect to securing patent protection for iLife and his knowledge about how to invalidate iLife's patents, a reasonable inference can be drawn that Lehrman knew about the progress of the patent

applications in Europe, including that invalidating prior art had been identified and relied upon by the EPO, but failed to disclose that prior art to the PTO with deceptive intent.

A reasonable inference can be drawn that Lehrman and Munck withheld these prior art references with a specific intent to deceive the PTO, based upon the fact that the EPO had cited them as a basis for rejecting iLife's foreign counterpart applications. Although intent to deceive can no longer be inferred from materiality and knowledge at the merits stage of a case, Therasense, 649 F.3d at 1290, the facts alleged in Body Media's counterclaim provide the necessary factual predicate for pleading deceptive intent at the pleading stage. Exergen, 575 F.3d 1330.

The decisions relied upon by iLife to support its contention that Body Media's claim for inequitable conduct fails to plead the requisite intent based upon a failure to disclose a prior art reference are distinguishable. For instance, in Prowess, the references were publications independently known to the inventors – none were prior art patents relied upon by a foreign patent office to reject a related patent application. Prowess, Inc. v. RaySearch Labs., AB, 952 F.Supp.2d 638, 650-53 (D. Md. 2013). Similarly, in Exergen, the prior art patent was voluntarily disclosed during prosecution of one patent application, but not disclosed during prosecution of another patent. The court concluded that that alleged nondisclosure, without more, provided no basis to infer deceptive intent. Exergen, 575 F.3d at 1331. Again, there is no indication that any patent office relied upon that piece of prior art in rejecting a related patent application. Abaxis is likewise distinguishable because the district court concluded that the amended pleading provided no basis to find that the inventor knew that a prior art reference was material. Abaxis, Inc. v. Cephid, No. 20-2840, 2011 WL 3741501, at *4-6 (N.D. Cal. Aug. 25, 2011). Here, the EPO's identification of the references as invalidating prior art, and its rejection of foreign counterpart

applications based upon that prior art, provides a basis to infer intent for purposes of assessing the sufficiency of Body Media's pleading.

The EPO Prior Art, standing alone, is a sufficient factual predicate for pleading a claim of inequitable conduct with respect to the '331, '461, and '890 Patents based upon both Munck and Lehrman's knowledge. Twombly, 550 U.S. at 556. The EPO Prior Art provides no factual predicate, standing alone and based solely upon the chronology of events, for a claim that the '481 or '939 Patents, which were issued in October 2001 and March 2004, are unenforceable due to inequitable conduct. The EPO first identified European Patent Application No. 0877346 as an invalidating reference in an April 29, 2004 search report. (ECF No. 103-1.) The first EPO communication rejecting one of iLife's EPO Applications based upon this reference is dated August 2, 2004. (Id.) U.S. Patent No. 6,160,478 and British Patent Application Publication GB2323196 were not identified as invalidating references in the European proceedings until January 2006, and were not cited as a basis for rejecting iLife's other foreign counterpart application until June 30, 2006. (Id.)

No facts are pled to support any inference that the EPO Prior Art was known to Munck at the time the '481 or '939 Patents were being prosecuted before the PTO, i.e., between September 1999 and March 2004. An inference can be made, however, that Lehrman knew about the EPO Prior Art at the time the '939 Patent was being prosecuted, based upon the statements he made in the February 24, 2003 email about knowing how to invalidate iLife's patents. See supra Sec. III.A. Fact discovery might prove otherwise, but as drafted, Body Media's inequitable conduct counterclaim based upon the EPO Prior Art must be limited to the unenforceability of the '939 Patent (based upon Lehrman's knowledge) and of the '331, '461, and '890 Patents (based upon Lehrman's and Munck's knowledge).

C. **Infectious Unenforceability**

Body Media's averment that the doctrine of "infectious unenforceability" applies to the '331 and '890 Patents is inapposite under the rulings set forth above. (ECF No. 73 ¶ 60.) The court found that Body Media's allegations about Lehrman's and Munck's knowledge of the EPO Prior Art are sufficient to state a direct claim that the '331 and '890 Patents, as well as the '461 Patent, are unenforceable due to inequitable conduct. See supra Sec. III.B. The court found that Body Media sufficiently pled a claim of inequitable conduct with respect to the '939, '331, '461, and '890 Patents based upon the statements made by Lehrman in his February 2003 email, when combined with the EPO's rejection of foreign counterpart patent applications based upon the EPO Prior Art. See supra Sec. III.A. The '481 Patent, however, was issued before Lehrman's email was drafted and before the EPO Prior Art was cited, making it impossible for either factual averment to support a claim of inequitable conduct with respect to that patent.

Body Media affirmatively asserts that "infectious unenforceability has no bearing on inequitable conduct committed during prosecution of the '481… Patent[]" and that the doctrine applies only to later-issued patents, not earlier-issued patents. (ECF No. 97 at 18-19.) Body Media provides no basis for this court to apply the doctrine to the earlier-issued '481 Patents under the rulings set forth above. The court does not foreclose the possibility that fact discovery might reveal that inequitable conduct occurred during prosecution of the '481 Patent, or that Body Media might ultimately prove some kind of reverse infectious unenforceability theory,[1] but, based upon the pleading before this court, Body Media fails to state a plausible claim of inequitable conduct with respect to the '481 Patent.

---

[1] Although there is no indication that such a doctrine has yet been applied by any federal court, the possibility cannot be foreclosed by this court, based upon the presently undeveloped factual record. Pharmacia Corp. v. Par Pharmaceutical, Inc., 417 F.3d 1369, 1374 (Fed. Cir. 2005); Duhn Oil Tool, Inc. v. Cooper Cameron Corp., 609 F.Supp.2d 1090, 1098 (E.D. Cal. 2009).

## IV. Conclusion

For the reasons set forth above, iLife's motion to dismiss is denied. Body Media sufficiently pled a counterclaim that the '939, '331, '461, and '890 Patents are unenforceable due to inequitable conduct. Discovery shall proceed on those claims, and with respect to probing the information known to Lehrman in February 2003, and to Lehrman and Munck about the EPO patent prosecutions. Should facts be learned that support a plausible claim that the '481 Patent is unenforceable due to the instances of inequitable conduct currently alleged by Body Media, leave to amend may be sought. As currently pled, however, there is an insufficient factual basis for a reasonable inference that either Lehrman or Munck possessed information material to the patentability of the '481 Patent while it was being prosecuted.

Dated: March 6, 2015                             BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge